

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-07-454-CV

IN THE INTEREST OF S.R.,
J.R., AND B.R.,
CHILDREN

------------

### FROM THE 271ST DISTRICT COURT OF WISE COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### Introduction

Appellant Heather R. appeals the trial court's order terminating her parental rights to her children, S.R. (Sarah), J.R. (Josh), and B.R.(Becca).[2] In two points, appellant argues that the evidence is legally and factually insufficient to support the trial court's best interest finding. We affirm.

---

[1] *See* TEX. R. APP. P. 47.4.

[2] We are using fictitious names in accordance with proposed TEX. R. APP. P. 9.8, 71 TEX. B.J. 287–88 (Tex. 2008, scheduled to take effect Sept. 1, 2008).

## Background Facts

On March 17, 2006, Kevin Campbell, an investigator with the Texas Department of Family and Protective Services (TDFPS) in Wise County, received an allegation of neglectful supervision, physical abuse, and sexual abuse of appellant's children, ten-year-old Sarah, six-year-old Josh, and five-year-old Becca.[3] Campbell also received information that the house was roach-infested and that the children were living in deplorable conditions. Campbell visited appellant's home, which was a trailer located on Lot A in Newark, Texas, and observed roaches crawling on the floor, inside containers in the kitchen, in the frying pan, in the refrigerator's egg tray, in the bedding, and on the walls. Campbell also noticed that an extension cord ran from the trailer house to another trailer house to provide electricity and that there was only enough electricity for the television. The trailer was lit by candles in the living room. Additionally, the water pressure was nonexistent, and the hot water heater was not functioning. The toilets were unsanitary and could not be flushed because of the lack of water. Unwashed dishes were stacked in the kitchen, and Campbell could tell that they had been sitting for a long time. He also observed

---

[3] Appellant had another child, twelve-year-old T.J., who lived with his father, Thomas R., and then with appellant's sister, Crystal Mendoza. Appellant had previously signed over guardianship of T.J. to Mendoza.

trash piled up in the kitchen. The floor contained numerous holes, which were covered with large road signs.

TDFPS removed Sarah, Josh, and Becca and told appellant that she needed to clean her home so that it would be a safe environment for her children. Appellant complied, and TDFPS returned her children around August 2006. However, a few weeks later in September 2006, TDFPS removed the children for a second time after appellant left them with relatives, Tiffany Taylor and Amber Spivey, because TDFPS believed that appellant had abandoned them and because they were living in similar, unsafe conditions as before. While in Taylor and Spivey's care, the children lived in a ten-by-ten shed with one couch, no running water, and a nonfunctional toilet; there was also a strong urine smell. Taylor and Spivey told TDFPS caseworker Stephanie Flavin that appellant was not helping them financially.

Flavin, who received appellant's case in mid-September 2006, testified that the children were placed in foster care until November and then went to live with appellant's brother and sister-in-law, Heath and Sheila. Sheila testified that appellant steadily visited the children for a while but then her visits became more sporadic. She stated that the interaction between appellant and her children was always positive, and the kids were happy to see her. Sheila thought that the visits were appropriate and that appellant seemed attentive

3

and affectionate. In fact, appellant called almost every night. The children were with Heath and Sheila until April 2007 when Sheila had to return the children to TDFPS because they could not financially take care of them. Sheila testified that she was willing to let the children live with her and be their guardian, but she could not accept full financial responsibility for them. Sheila also testified that she and her husband could not afford medical and child care for their own four children plus three more. Sheila stated that appellant did not financially assist Heath and Sheila although she did provide things such as clothing and toiletries as needed. Sheila testified that she did not believe it was in the children's best interest to have appellant's parental rights terminated. After Sheila returned the children, TDFPS placed them in foster care.

TDFPS gave appellant a service plan, which included two types of parenting classes, individual counseling, a psychological evaluation, and drug testing. TDFPS required appellant to attend a parenting class on nutrition and cleanliness and a parenting class at the Family Guidance Center; appellant attended only the parenting class at the Family Guidance Center. She claimed she could not attend the nutrition and cleanliness class because of her work schedule. Additionally, appellant did not complete counseling because of her work schedule although Flavin set up counseling services for appellant in Fort Worth. Flavin made appointments with appellant to visit her residence in

4

Newark, which was a different trailer on the same property located on Lot B, but appellant usually canceled because of her work schedule. Each time Flavin visited the residence, appellant was not there. In November 2006, appellant informed Flavin that she was not living on Lot B at the Newark address but instead was living with various friends. The last time Flavin visited appellant's residence, the trash pile which TDFPS requested that appellant remove had gained in height; there were abandoned vehicles, car parts, an engine, a boat, an old mattress, and other items such as tin in the yard that could injure or cut the children.

TDFPS also required appellant to turn in documentation regarding her employment; however, Flavin testified that appellant never provided any pay stubs or paperwork. Additionally, TDFPS also required appellant to be randomly drug tested, and appellant submitted to two tests, which were negative. However, appellant did not show up for any more drug tests. In addition to completing one of the required parenting classes, appellant completed a psychological evaluation in January 2007. TDFPS set up visitation for appellant on Sundays, but she would often show up late or leave early. Flavin testified that appellant's interaction with the children during visitation was minimal.

Mary Graves, a therapist with Catholic Charities, had been seeing the children since April 2007 when they were referred for adjustment issues.

5

Graves testified that all of the children said their home was not in good shape. Sarah was left alone with the little ones, which scared her, and she was terrified of returning to that environment. Graves testified that Sarah had self-esteem issues because she was in a lower grade as a result of missing so much school. Graves also said Sarah had a habit of parenting the little ones. Sarah craved structure and security, and she did not want the responsibility of caring for her younger siblings. However, Sarah was progressing well and happier with herself.

Graves testified that when she first saw Josh, he was very shy, rarely smiled, and sad. He had serious sleep problems and was anxious and scared a lot. He was also abrasive towards his sister Becca. Additionally, Josh would have meltdowns and become "unglued" by kicking, hitting, and biting; he would also hold and smear feces. Graves had talked to him about his anger and how to manage it so that he did not get in trouble or hurt himself or others. She testified that his meltdowns could sometimes be avoided.

Graves testified that Becca was a "cutie" and wonderful to talk to; however, Becca whined and tried to get her own way. Graves also said that Becca tried to get Josh in trouble. Graves stated that Becca was oppositional and defiant; she did not want to obey and threw things while kicking and screaming. Becca also held and smeared feces. Additionally, Becca did not like

6

to sleep. Becca had also acted out sexually; for example, she exposed herself to her brothers and other boys. Graves testified that Becca had learned to accept "no" and worked on understanding boundaries. Graves had also talked with Becca about body safety. Graves testified that the type of living conditions the children experienced amounted to abusive and neglectful conduct, and she believed that it was not in their best interest to return to appellant.

At trial, appellant testified that she did not abandon her children but that she worked late and left them with her family because she did not want to disrupt their sleeping routine and school schedule. Appellant testified that she left her children with her family during the week but would pick them up on the weekends. She never intended her children to stay there on a permanent basis. She also testified that she provided for her children by giving Taylor and Spivey diapers, wipes, food, clothing, gas money, or whatever they needed. After TDFPS removed her children for the second time, appellant stated that she attended visits although she missed a couple of times because of work. Appellant testified that she was bonded with her children.

Additionally, appellant testified that she participated in drug tests and that she never tested positive. Appellant stated that she had not complied with the counseling requirement because of paperwork issues. She testified that she

7

completed parenting classes. Appellant also testified that she worked at Popeye's, but she did not provide Flavin with any check stubs.

Appellant testified that she was willing to leave her current residence if her children could live with her sister Crystal Mendoza. She and Mendoza lived on the same property, but in different trailers. She and Mendoza switched trailers after appellant's children were removed so that, at the time of trial, Mendoza lived in the trailer that TDFPS determined was an unsafe environment at the time of removal. Appellant testified that if she got her children back, they would stay with Mendoza, who had a clean home with ample room. The trailer had been painted, had new carpet installed, and had been sprayed for bugs, and the holes in the floor had been repaired.

Mendoza also testified that she and her husband had renovated the trailer. The trailer had electricity and running water with working toilets. She also testified that she was willing to let appellant and her children live with them for as long as was necessary. Although there would be seven children and three adults, she also stated that there was adequate space.

Adrienne Shabazz, a licensed social worker who did kinship studies for TDFPS, testified that the property on which appellant lived contained two or three trailers. Shabazz completed a home study on Mendoza because she offered to take Sarah, Josh, and Becca. Shabazz testified that Mendoza's

8

trailer, which was the trailer the children had been living in when they were removed, was very small and sparsely furnished. The trailer had three bedrooms for seven children and three adults. Shabazz was concerned because appellant lived on the property, and thus she was in close proximity to the children. Shabazz was also concerned because while she was there, one of Mendoza's children was out of control; Mendoza also told Shabazz that she had never taken one of her children to the doctor. Although the home was tidy, Shabazz saw roaches crawling around, but she did not see any holes in the floor or trash piled up. Although nothing about the home was "glaringly dangerous," Shabazz believed the trailer was not an appropriate home for the children because it was too small, appellant resided too close by, and Mendoza could not control her own children.

In addition, appellant testified that her mistakes had traumatized her children but that she wanted to make up for her wrong decisions. Appellant said that she regretted her mistakes and that she had changed her way of thinking. Appellant stated that she attended church and had the support of family and friends. Appellant also testified that she had not used drugs, had never been convicted of a crime, and had never abused her children.

After a bench trial on December 6, 2007, the trial court determined that appellant (1) knowingly placed or knowingly allowed her children to remain in

9

conditions which endangered their physical and emotional well-being, (2) that she failed to comply with the provisions of the court order which were necessary for her to obtain the return of her children, and (3) that termination was in their best interest.[4] [CR 19] *See* TEX. FAM. CODE ANN. §§ 161.001(1)(D), (O), (2) (Vernon Supp. 2007). Appellant timely filed this appeal.

### Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b)

---

[4] At trial, Thomas executed an affidavit of relinquishment of his parental rights to Sarah, Josh, and Becca. He did not appeal the trial court's order.

10

(Vernon Supp. 2007); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  TEX. FAM. CODE ANN. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence.  TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings.  *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied).  It is defined as the "measure or degree of proof that will

11

produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

## A. Legal Sufficiency

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573, 574. And even when credibility issues appear in the

12

appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

**B. Factual Sufficiency**

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the termination of the parent's parental rights would be in the best interest of the child. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable fact-finder could not have credited disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266-67.

**Applicable Law**

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with

13

a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that

14

termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**Analysis**

**A.    Desires of the children**

At the time of trial, Sarah was ten years old, Josh was six years old, and Becca was five years old. Therapist Graves testified that Sarah had taken on the parenting role to her younger brother and sister because she had been left alone with them. Graves also testified that Sarah was terrified that if they went back with appellant, she would be left alone with her siblings again. Sarah's aunt Sheila, however, testified that Sarah wanted things back the way they were—back to normal. Sheila also stated that Sarah wanted her mother and father. Becca would also tell Sheila, "I want to go home . . . [w]hen do I get to go home?" Sheila testified that the children loved appellant and that they were bonded.

**B.    The emotional and physical needs of the children now and in the future, and the emotional and physical danger to the children now and in the future**

The evidence shows that appellant's home was an unsafe, unhealthy environment and that appellant had frequent changes of residences and multiple jobs. Appellant admitted that her home on Lot A in Newark was unsafe

15

because it was infested with cockroaches and dirty; she stated that her children, at that time, were living in an endangering situation. Appellant also admitted that leaving her children with Taylor and Spivey was inappropriate because the space was too small. Appellant testified that, at the time of trial, she did not have stable housing, but she also testified that she lived on Lot B after switching trailers with her sister. Appellant stated that she had been living there about a month, but had not unpacked and that she often slept at friends' homes. Flavin testified that the exterior of appellant's current residence on Lot B, which Flavin was never able to inspect because appellant did not keep any of her appointments, had worsened in condition with many objects scattered in the yard that would be dangerous to the children.

Appellant testified that, at the time of trial, she had been working at Popeye's for three to four months. Before that she was employed at Ryder, D&B Entertainment, and Michael's. However, the only verification Flavin received regarding appellant's employment was from Michael's. The evidence also shows that appellant never provided financial support for her children while they were in foster care or living with relatives. However, appellant did provide clothing or other supplies that the children needed.

The record reflects that appellant's sister, Mendoza, who lived in appellant's old home on Lot A, had renovated the trailer and offered to allow

16

appellant and the children to live with her family. However, TDFPS believed that Mendoza's home, although not "glaringly dangerous," would not be suitable for an additional three children and another adult. TDFPS did not believe that seven children and three adults could adequately live in a three bedroom trailer.

The evidence also demonstrates that Sarah, Josh, and Becca had emotional problems. Sarah had self-esteem issues and feared returning to the same living conditions where she would have to parent her siblings. Josh had meltdowns, which included kicking, hitting, biting, and smearing feces. Becca also had tantrums and smeared feces. Becca told Graves that she wanted to provoke an adult into biting her because that would make her feel better. Becca had also sexually acted out, and therapy reports indicated that the children had made outcry statements to family members although TDFPS had been unable to pinpoint a specific person that may have been abusive. Graves also testified that Sarah had witnessed a lot of sexual behavior.

**C. The parental abilities of the individuals seeking custody, and the programs available to assist these individuals to promote the best interest of the children**

The evidence demonstrates that appellant did not sufficiently work her service plan. Appellant attended one of the two required parenting classes, completed the psychological evaluation, and submitted to two drug tests.

17

However, appellant did not attend the parenting class on nutrition and cleanliness, did not complete counseling, did not meet with Flavin for a home inspection, did not provide employment documentation, and did not show up for additional drug tests. Appellant told Flavin that she was unable to participate in or complete many of her services because of her work schedule. However, appellant never provided Flavin with documentation to verify her reasons for not participating in many of her services.

Flavin testified that appellant sporadically visited the children, and when she did visit, interaction with her children was minimal. For example, appellant would ask Sarah to take the younger children to the restroom, and appellant did not bring food during visitation as requested by TDFPS. CASA worker Michele Duncan testified that appellant did not play with the children although she did ask how they were doing.

Although appellant completed some of her services, Flavin and Duncan recommended that appellant's parental rights be terminated because of appellant's lack of progress, missed opportunities to visit with her children, minimal interaction with her children at visitations, and her failure to complete all of the requested services. Furthermore, the children needed a permanent home with stability and security.

**D.** **The plans for the children by these individuals or by the agency seeking custody, and the stability of the home or proposed placement**

TDFPS offered no evidence regarding future plans for the children.

Appellant sought to have the children placed with her sister Mendoza, who lived in appellant's old trailer, which had been renovated. TDFPS had concern over appellant's close proximity to the children because she lived in another trailer on the property. However, appellant testified that she would move off the property if that allowed the children to be placed with Mendoza.

**E.** **The acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of appellant**

As for the parent-child relationship, there is evidence that Sarah had taken on the parenting role to her two younger siblings.

In sum, the record demonstrates that although appellant participated in some of her services, appellant's failure to complete her services and maintain appropriate housing, and her sporadic visits with her children, all demonstrate that it was in Sarah's, Josh's, and Becca's best interests that appellant's parental rights be terminated. *See* TEX. FAM. CODE ANN. § 161.001(2).

Viewing all the evidence in the light most favorable to the judgment, we hold that the evidence is legally sufficient to support the trial court's finding that termination of appellant's parental rights was in the children's best interest.

*See id*.  Viewing the same evidence in a neutral light, we hold that it is also factually sufficient to support the trial court's findings that termination of appellant's parental rights was in the children's best interest.  *See id.*  We overrule appellant's two points.

### Conclusion

Having overruled all of appellant's points, we affirm the trial court's judgment terminating appellant's parental rights.

TERRIE LIVINGSTON
JUSTICE

PANEL F:    CAYCE, C.J.; LIVINGSTON, and DAUPHINOT, JJ.

DELIVERED: June 5, 2008